**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AXCESS INTERNATIONAL, INC.<br><br>Plaintiff,<br><br>v.<br><br>GENETEC (USA) INC.,<br><br>Defendant. | **Civil Action 18-1276-MN** |

**MEMORANDUM IN SUPPORT OF GENETEC (USA) INC.'S**
**FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**
**MOTION TO DISMISS FOR UNPATENTABLE SUBJECT MATTER**

Of counsel:
Grant Kinsel (pro hac vice)
PERKINS COIE, LLP
1201 3rd Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-3516
gkinsel@perkinscoie.com

Arthur G. Connolly, III (#2667)
CONNOLLY GALLAGHER LLP
1000 West Street, Suite 1400
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
*Attorneys for Genetec (USA) Inc.*

Dated: February 8, 2019

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........ 1

INTRODUCTION ........ 1

SUMMARY OF ARGUMENT ........ 2

1. Facts ........ 3

   1.1. The Parties ........ 3

   1.2. The ’158 patent is directed to the abstract idea of using generic computer, video, and RFID equipment to remotely monitor, control access to, and/or generate a report about a facility or area. ........ 4

2. Argument ........ 6

   2.1. *Alice* step one: Patentability requires more than claiming a result. ........ 7

   2.2. *Alice* step two: There is nothing more. ........ 15

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**CASES**

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) .................... 2, 3, 14

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) .................... 13, 14

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .................... 2, 7, 16, 20

*Apple Inc. v. Ameranth, Inc.*,
842 F. 3d 1229 (Fed. Cir. 2016) .................... 14, 15

*Axcess Int'l v. AMAG Tech.*,
Case No. 16-cv-01360 (E. D. Tex. Dec. Dec. 5, 2016) .................... 3

*Axcess Int'l v. Avigilon USA Corp.*,
Case No. 19-cv-00009 (E. D. Tex. Jan. 10, 2019) .................... 3

*Axcess Int'l v. Bosch Security Sys., Inc.*,
Case No. 19-cv-00226 (D. Del. Feb. 4, 2019) .................... 3

*Axcess Int'l v. Dual Core LLC*,
Case No. 16-cv-01358 (E. D. Tex. Dec. 5, 2016) .................... 3

*Axcess Int'l v. Honeywell Int'l*,
Case No. 19-cv-00227 (D. Del. Feb. 1, 2019) .................... 3

*Axcess Int'l v. TransCore LP*,
Case No. 17-cv-01697 (N. D. Tex. Apr. 28, 2017) .................... 3

*Axcess Int'l v. Virtual Surveillance, LLC*,
Case No. 16-cv-01359 (E. D. Tex. Dec. 5, 2016) .................... 3

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .................... 16, 18

*British Telecomm. PLC v. IAC/Interactive Corp*,
Civil Action No. 18-366-WCB, 2019 WL 438335 (D. Del. Feb. 4, 2019) .......... passim

*DDR Holdings, LLC v. Hotels.com L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 15

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) .......... 2

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......... 15

*Fuller v. Yentzer*,
94 U.S. 288 (1877) .......... 13

*Int'l v. Dual Core LLC*,
Case No. 16-cv-01358 (E. D. Tex. Dec. 5, 2016) .......... 3

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......... 3

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) .......... 6, 16

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......... 15

*O'Reilly v. Morse*,
56 U.S. (15 How.) 62 (1854) .......... 12, 13

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) *cert. denied*, 135 S. Ct. 2907 (2015) .......... 3, 15

**STATUTES**

35 U.S.C. § 101 .......... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) .......... 1

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent case. Axcess accuses Genetec of infringing U.S. Patent No. 7,286,158 (the "'158 patent"). Axcess asserts independent Claim 14 and dependent Claims 15–18. But the claims of the '158 patent, including asserted Claims 14 through 18, recite patent-ineligible subject matter under 35 U.S.C. § 101, and are, therefore, invalid. Accordingly, Genetec requests that the Court dismiss this action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## INTRODUCTION

For decades, technologists and innovators around the globe have worked on systems for controlling access to secure areas using radio frequency identification—RFID. In the 1970's, the U.S. Government at Los Alamos National Laboratory used RFID to track nuclear materials by putting a transponder in a truck and readers at gates of secure facilities. The gate antenna would wake the transponder in the truck, and the transponder would respond with an ID and potentially other data to open the gate. Today, RFID systems are ubiquitous, giving access to locked garages, office lobbies, and elevators all over the world.

Axcess's patent—U.S. Patent No. 7,286,158 (the "'158 patent")[1]— claims ownership over the naked idea of using RFID and video to secure an area without contributing any actual technology for doing it. Asserted Claim 14 requires "eliciting a radio response from a radio frequency identification (RFID) tag at an access door of a secure area," "determining whether access" is authorized, "recording a video image," and "controlling access to the door." The claim is technologically vacuous, providing no specific technological solution for achieving any of these steps. It instead merely claims the result—using RFID

[1] Cmplt. at Ex. A [Dkt. #1] (hereafter "'158 patent").

and video to secure areas—without claiming how that result is to be achieved. Axcess's patent, thus, attempts to cover, not only decades of groundbreaking research by true RFID innovators, but also the solutions to be yet devised by others. Put differently, Axcess seeks to cover *any* technological advancement in the use of RFID and video to secure a location while contributing nothing to that technology. This is strictly prohibited by the Supreme Court's 101 jurisprudence.

## SUMMARY OF ARGUMENT

1. The '158 patent claims a result disembodied from any specific technological means to achieve it. Under controlling Federal Circuit decisions, such technologically vacuous patents are patent-ineligible under Section 101.[2] Because the '158 patent claims merely the naked idea of monitoring and controlling access to a location rather than any specific technological solution for achieving that result, the patent fails at step 1 of the framework established by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*.[3]

2. The '158 patent also fails at step two of the *Alice* framework because it does not recite any inventive concept that transforms the claims into patent-eligible subject matter. Instead, the '158 patent recites generic RFID, video, and computer equipment used precisely as that equipment is—and has al-

---

[2] *See, e.g.*, *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ((“[T]he claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.”), *petition for cert filed*, (U.S. Feb. 28, 2017) (No. 16-1047); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016) (holding that “[t]he claims, defining a desirable information-based result and not limited to inventive means of achieving the result, fail under § 101”).

[3] 573 U.S. 208 (2014).

ways been—used. Claims that merely say apply the abstract idea to standard and generic equipment are routinely found unpatentable.[4]

## 1. Facts

### 1.1. The Parties

At one point in its past, Axcess may have been a going concern. Now, it mainly attempts to enforce the ’158 patent, filing numerous cases in districts around the country, while remaining ever vigilant to avoid serious review of the ’158 patent. So, in the roughly dozen cases Axcess has filed, it has studiously avoid substantive rulings on the ’158 patent’s compliance with Section 101,[5] lest the ’158 patent be shown for what it is—a technologically vacuous attempt to claim a naked idea.

By contrast with Axcess, for the last twenty years, Genetec has been designing, building, managing, and maintaining IP-based security solutions for

---

[4] *See, e.g., Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) ("[W]hen a claim directed to an abstract idea 'contains no restrictions on how the result is accomplished … ' then the claim is not patent-eligible."); *Affinity*, 838 F.3d at 1271 ("The features set forth in the claims are described and claimed generically rather than with the specificity necessary to show how those components provide a concrete solution to the problem addressed by the patent"); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) ("[C]onventional steps, specified at a high level of generality,' [are] insufficient to supply an 'inventive concept.'") *cert. denied*, 135 S. Ct. 2907 (2015).

[5] *See, e.g., Axcess Int'l v. Dual Core LLC*, Case No. 16-cv-01358 (E. D. Tex. Dec. 5, 2016) (12(c) Motion to Dismiss filed, case dismissed before ruling); *Axcess Int'l v. Virtual Surveillance, LLC*, Case No. 16-cv-01359 (E. D. Tex. Dec. 5, 2016) (consolidated with 16-cv-01358); *Axcess Int'l v. AMAG Tech.*, Case No. 16-cv-01360 (E. D. Tex. Dec. Dec. 5, 2016) (consolidated with 16-cv-01358); *Axcess Int'l v. TransCore LP*, Case No. 17-cv-01697 (N. D. Tex. Apr. 28, 2017) (12(b)(6) Motion to Dismiss filed, case dismissed before ruling); *Axcess Int'l v. Avigilon USA Corp.*, Case No. 19-cv-00009 (E. D. Tex. Jan. 10, 2019); *Axcess Int'l v. Honeywell Int'l*, Case No. 19-cv-00227 (D. Del. Feb. 1, 2019); *Axcess Int'l v. Bosch Security Sys., Inc.*, Case No. 19-cv-00226 (D. Del. Feb. 4, 2019).

governments and businesses across the country and throughout the world. These systems include, among other things, market-leading access control backend used to manage access control.

### 1.2. The ’158 patent is directed to the abstract idea of using generic computer, video, and RFID equipment to remotely monitor, control access to, and/or generate a report about a facility or area.

The ’158 patent is drawn to broad, functional claims that seek to claim any and all ways to use RFID, video, and computers to monitor and secure a remote location. Each independent claim recites the use of generic RFID systems, video cameras, and computer systems to grant access to secure areas, record people accessing the secure areas, and report on that access. Axcess asserts independent Claim 14:

> A method of providing identity verification for access to a secure area, comprising:
>
> eliciting a radio response from a radio frequency identification (RFID) tag at an access door of a secure area;
>
> determining whether access by a wearer of the RFID tag to the secure area is authorized based on the radio response;
>
> recording a video image of the wearer of the RFID tag at the access door; and
>
> controlling access to the door to provide access to the secure area by the wearer only if access by the wearer is authorized.

While the specification identifies RFID systems and video systems described in Axcess’s other patents as *possible* systems,[6] the claim itself is expressly agnostic as to how the steps are performed.

The asserted claims that depend from Claim 14—Claims 15–18—add nothing to make Claim 14 any less abstract. Claim 15 recites that the method

---

[6] ’158 patent at 4:65–5:14 (RFID systems); 6:14–39 (video systems).

includes "recording the video image in response to authorized access," and Claim 16 recites that the recording is of "unauthorized access." The claims say nothing about how the determination—authorized or unauthorized—is made, leaving the hard work of creating the systems that can actually do that to others. Claim 17 includes "recording the video image in response to the radio response from the RFID tag"—in other words, turn the video on when an RFID tag is near. Nothing in the claim describes how to do this. And Claim 18 recites that the method includes "recording a series of video images of the wearer of the RFID tag at the access door." Again, how any of this is to be accomplished is left out of the claim.

The other two independent claims—which are not asserted—are similarly generic, and devoid of invention. Independent Claim 1 recites,

> A method for providing integrated remote monitoring services, comprising:
>
> receiving and storing radio frequency identification (RFID) data from an RFID system at a remote facility of a subscriber;
>
> receiving and storing video data from a video system at the facility;
>
> providing the subscriber with access to the stored RFID and video data;
>
> providing the subscriber with access to and control of a video camera in the video system at the facility; and
>
> processing the RFID data to generate a report for the subscriber.

Claim 19 also embraces the abstract. Claim 19 is directed to a method of notifying a subscriber of an alert condition—like a common burglar alarm that notifies a monitoring facility—and recites,

> A method for remotely notifying a subscriber of an alert condition at a facility, comprising:

> receiving a radio frequency identification (RFID) action from an RFID system at a facility;
>
> determining whether the RFID action corresponds to a pre-defined alert condition;
>
> obtaining a video image associated with the RFID action only if the RFID action corresponds to a pre-defined alert condition; and
>
> electronically transmitting notice of the alert condition along with the video image for delivery to a manager of the facility.

The remaining dependent claims add nothing to the independent claims to move them from generic recitations of desired results to something more specific. Instead, the dependent claims merely select from well-know, conventional available options. For instance, Claim 2 (depending from Claim 1) allows the information to be "received over the Internet." Claim 2 does not purport to improve the internet or provide some innovative solution to problems of combining the internet with the other, recited generic technology. Claim 20 (depending from Claim 19) similarly recites that the alert condition information is sent by email over the internet. Like Claim 1, Claim 20 makes no pretense to improving email or the internet or overcoming some technological hurdle associated with either.

**2. Argument**

Patent eligibility is decided under 35 U.S.C. § 101, which embodies the cornerstone prohibition against patenting ideas or results, as opposed to specific technological advances. Section 101 permits issuance of a patent only for a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." Laws of nature, natural phenomena, and—importantly for this case—abstract ideas are excluded by section 101.[7]

[7] *E.g.*, *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012).

In *Alice v. CLS Bank*, the Supreme Court established a two-prong framework for determining whether claimed subject matter is patentable under 35 U.S.C. § 101.[8] At step one, the Court determines whether a claim is directed to an abstract idea. At step two, the Court determines whether the claim adds something more to the abstract idea, so that a patent on the idea does not result in unacceptable preclusion. The Supreme Court characterized an "inventive concept" as an element or "combination of elements [that is] sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."[9] Unless these additional elements add something significant to the abstract idea, the claim is ineligible. Merely implementing a naked idea using well-known components or functions, limiting the idea to a particular technological environment, or adding other token steps is insufficient to save a claim from invalidity under 35 U.S.C. § 101.[10]

### 2.1. *Alice* step one: Patentability requires more than claiming a result.

Just this week in *British Telecomm. PLC v. IAC/Interactive Corp* ("*BT*"),[11] Circuit Judge Bryson, sitting by designation in this District, explained how the *Alice* step-one analysis proceeds. As Circuit Judge Bryson explained, "[r]ather than a unitary test [for abstractness], what has emerged from the section 101 cases is a group of related principals that can be applied in gauging whether or not a patent claim is directed to an abstract idea."[12] Circuit Judge Bryson identified three principles by which courts determine claims to be abstract: (1) "the courts have characterized 'method[s] of organizing human activity' as abstract"; (2)

---

[8] *Alice Corp. Pty Ltd.*, 573 U.S. at 208.

[9] *Mayo Collaborative Servs.*, 566 U.S. at 72-73.

[10] *Alice Corp. Pty. Ltd.*, 573 U.S. at 223.

[11] Civil Action No. 18-366-WCB, 2019 WL 438335 (D. Del. Feb. 4, 2019).

[12] *BT*, 2019 WL 438335, *6.

"as applied to computer applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform 'economic or other tasks for which a computer is used in its ordinary capacity'"; and (3) "in determining whether a particular claim is directed to an abstract idea, courts have focused on whether the claim is purely functional in nature rather than containing the specificity necessary to recite how the claimed function is achieved."[13] All three of Circuit Judge Bryson's categories apply here.

Each independent claim is directed to a mere abstract idea that has characterized human behavior for eons—keeping a watch over private property, and only granting access to secure areas to authorized people. For instance, Claim 14 recites four steps to secure access: (1) "elicit[e]" a radio response from an RFID tag; (2) "determin[e]" if the wearer of the tag is "authorized"; (3) "record a video" of the wearer of the tag; and (4) "control[]" access to the door—open it.

Other than the token references to RFID and video, the generic steps of Claim 14 are indistinguishable from what people have been doing since the advent of private property, and probably before that too. First century AD Romans created iron locks and keys that granted access to authorized persons—that is, those with keys. An armed guard grants access to authorized persons showing identification, while most building lobbies have been videotaped since the advent of video-recording technology—which Axcess does not and cannot claim to have invented. A teenager working the counter of a 24-hour convenience store grants access to patrons to use the restroom while the store lobby is being recorded by video. The point is that throughout human history, people

[13] *BT*, 2019 WL 438335, *6–7.

have protected their property by granting access to locations only to those who are authorized to be there, and locations with valuables have been using security cameras for decades. Claim 14 offers nothing but these generic steps, only vaguely connected to technology that is neither described in the claims, nor credibly claimed as invented by Axcess.

The other independent claims are similar to Claim 14. For instance, Claim 1 recites the abstract steps of (1) "receiving and storing" RFID data; (2) "receiving and storing video data" from a generic "video system at the facility"; (3) "providing the subscriber with access" to the stored RFID and video data; and (4) "processing the RFID data to prepare a report." Claim 19 is similarly abstract, reciting: (1) "receiving a" RFID "action"; (2) "determining whether the RFID action" is an "alert contention"; (3) "obtaining a video associated with the RFID action" if the "action" corresponds with an "alert contention"; and (4) "electronically transmitting notice of the alert" and "video" to the "manager of the facility." As with Claim 14, none of these steps are specified at anything but the most abstract level; none describe the *actual technology* Axcess's named inventor supposedly invented that "processes" the RFID data, "determine[s]" whether an "alert contention" is met, or performs any of these other recited functions. Instead, what the claims seek to cover is *any* use of generic RFID and video technology to perform actions people have performed since, at least, the advent of RFID and video-recording technology. Thus, the claims, as Circuit Judge Bryson put it, seek to claim "'method[s] of organizing human activity,'"[14] and are, accordingly, abstract.

Circuit Judge Bryson's category 2—"whether the claim in question is directed to an improvement in computer technology as opposed to simply providing

---

[14] *BT*, 2019 WL 438335, *6.

for the use of a computer to perform 'economic or other tasks for which a computer is used in its ordinary capacity'"[15]—applies here too. Asserted Claim 14 does not specifically recite a computer much less purport to improve it. It does, however, recite a step that requires "determining whether the wearer" of the RFID tag is authorized and then opening the door for authorized wearers. This *might* be performed by some type of computer technology. But the claim never specifies what computer technology accomplishes this or how it does so. Certainly this non-technological solution cannot be credibly claimed to be an improvement to the technology itself. Claim 1, at least, recites a "storing" and "processing" step, but does so in such a generic and uninformative way that it cannot be meaningfully argued that that step somehow "improved" computing technology. Claim 19 recites a step requiring "determining" whether the RFID action corresponds to a "pre-defined alert condition" and "electronically transmitting notice," but these steps, recited at the highest level of abstraction, cannot be considered improvements in computing technology. The claims do not say what the technology is; they certainly do not improve it.

Circuit Judge Bryson's category 3—functional claims that do not recite how the functions are achieved—is particularly apt for the claims of the '158 patent. Each of the claims recites a mere function without describing how that function is performed and without limiting the claim to any particular technological means to achieve it.

Claim 14 describes four functions: (1) "eliciting a radio response" from an RFID tag; (2) "determining" whether the wearer is authorized; (3) "recording a video image"; and (4) "controlling access to the door." The claims are silent as to how these functions are achieved. Nothing in the claim, for instance, de-

[15] *BT*, 2019 WL 438335, *6.

scribes *how* a radio response is "elicit[ed]." We know the claim requires a determination that the wearer is authorized to enter, but *how* is that determination made? What equipment makes it? What algorithm does it use? What inventive technology or technological improvement makes it possible? What innovation did the named inventor create to make this work? The claim is silent, seeking to cover any and all ways to make the determination—even if the ways were not invented by the inventor. The same is true with the "recording" a video image and "controlling" access to the door. In both cases, the claim seeks to cover the naked idea—recording video, granting access to a locked door—but is agnostic as to how the idea is achieved, and thus, seeks to cover all ways, however created. The claims that depend from Claim 14—Claims 15–18—are mirrors of Claim 14, reciting results like "recording the video image" when the tag wearer is authorized (Claim 15), or unauthorized (Claim 16). These claims make Claim 14 no less abstract.

The other independent claims are similar. For example, in Claim 1 somehow, someway "video data" is to be "receiv[ed] and stor[ed]." As to how, the claim is silent, except that it comes from a "video system at the facility." The claim contains no explanation about what the "video system" is. Somehow, someway, we are directed to "provid[e] the subscriber with access" to the RFID and video data, but we are never told how, and never told what particular technological advance the inventor is supposedly responsible for that made this possible. Claim 19 is the same. Somehow, someway, the result of "determining whether the RFID action corresponds to a pre-defined alert contention" is achieved, but the claim is agnostic as to how.

Functional claims—that is, claims that seek to cover end results without any limitation as to how those results are to be achieved—are particularly pernicious because they result in serious preclusion concerns, precluding *any way*

to achieve the result, regardless of whether the inventor invented those ways. This is why the Rule Against Functional Claiming is one of the long-standing, significant rules in the Patent Law, as Judge Bryson noted in *BT*.[16] The Rule Against Functional Claiming goes back at least as far as the Supreme Court's 1854 decision concerning Professor Samuel Morse's pioneering patent on telegraphy. In that case, one of Professor Morse's claims recited telegraphy in purely functional terms—that is, like the claims here, Professor Morse's claim was agnostic about what specific machines or other structures should be used to transmit letters electronically and at a distance. Stated differently, the claim sought the end result or naked function of telegraphy, however achieved, independent of specific machines used to achieve it, and thus claimed "the exclusive right to every improvement where the motive power is the electric or galvanic current, and the result is the marking or printing of intelligible characters, signs, or letters at a distance."[17] In striking the claim, the Court explained that the purpose of the prohibition against functional claiming—or the prohibition of owning results however achieved—is to protect the public's right to innovate:

> If this claim can be maintained, *it matters not by what process or machinery the result is accomplished*. For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification. His invention may be less complicated—less liable to get out of order—less expensive in construction, and in its operation….
>
> Nor is this all, while he *shuts the door against inventions of other persons*, the patentee would be able to avail himself of *new discoveries*

[16] *BT*, 2019 WL 438335, *7 ("the focus on functionality as a measure of patent eligibility has a long and notable pedigree.")

[17] *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112 (1854) (emphasis added).

> in the properties and powers of electro-magnetism which scientific men might bring to light. For he says he *does not confine his claim to the machinery or parts of machinery, which he specifies*; but claims for himself a monopoly in its use, *however developed*, for the purpose of printing at a distance. . . . The court is of opinion that the claim is too broad, and not warranted by law. [18]

Consequently, Professor Morse's patent was limited to the specific machinery or acts that he disclosed for achieving his telegraphic results.[19]

The Federal Circuit has repeatedly used this principle to reject result-focused claims under Section 101. In *Affinity Labs of Texas, LLC v. DIRECTV, LLC*,[20] the Federal Circuit invalidated claims directed to a broadcast system in which a cellular telephone located outside the range of a regional broadcaster receives content from the broadcaster in response to a user selecting that content for streaming.[21] The Federal Circuit found that the claims were directed to an abstract idea "that is untethered to any specific or concrete way of implementing it."[22] Just like the '158 patent, Affinity's claims were "entirely functional in nature."[23]

---

[18] *O'Reilly*, 56 U.S. at 113 (emphasis added). See also *id.* at 120 ("no patent can lawfully issue upon such a claim" for a mere result or "effect" instead of the "the process or machinery necessary to produce it").

[19] *Id.* at 117. *See also Fuller v. Yentzer*, 94 U.S. 288, 288 (1877) (It has long been the "established rule" that a patent "will not be sustained if the claim is for a result").

[20] *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1269 (Fed. Cir. 2016), petition for cert. filed (U.S. Feb. 27, 2017) (No. 16-1046).

[21] *Id.* at 1256.

[22] *Id.* at 1258.

[23] *Id.*

The patent in *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*[24] claimed a method and system for managing a library of media content on a website, streaming that content to a mobile device, and permitting a user to access and modify the media library using the mobile device.[25] The Federal Circuit found the claims to be directed to the abstract idea of "streaming user-selected content to a portable device" because they "d[id] no more than describe a desired function or outcome, without providing any limiting detail that confine[d] the claim to a particular solution to an identified problem."[26] "The purely functional nature of the claim[s] confirm[ed] that [they were] directed to an abstract idea, not to a concrete embodiment of that idea."[27] And the tangible components of the claimed system were "described and claimed generically rather than with the specificity necessary to show how those components provide[d] a concrete solution to the problem addressed by the patent."[28]

And in *Apple Inc. v. Ameranth, Inc.*, the Federal Circuit invalidated claims directed to generation of computer menus including those that can be modified by handwriting or voice recognition. The court found that the claims "call[] for the desired result" and "do[] not attempt to claim any method for achieving that result."[29] The Federal Circuit explained that claiming the "use of existing handwriting and voice capture technologies" "without providing how these elements were to be technologically implemented" does not render the claims

---

[24] 838 F.3d 1266 (Fed. Cir. 2016), petition for cert. filed (U.S. Feb. 28, 2017) (No. 16-1047).

[25] 838 F.3d at 1269.

[26] *Id.* at 1269, 1272.

[27] *Id.* at 1269.

[28] *Id.* at 1271.

[29] *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1244 (Fed. Cir. 2016).

patentable.[30] The claims of the ’158 patent similarly fail to articulate any concrete solution for achieving any of the results recited in the claims.

In stark contrast to the claims of the ’158 patent, claims that the Federal Circuit has upheld under Section 101 have provided a specific technological solution—something the ’158 patent lacks. For example, in *Enfish, LLC v. Microsoft Corp.*, the claims disclosed a new “self-referential” data structure and a specific “four-step algorithm” to accomplish their claimed improvement to computer databases.[31] In *McRO, Inc. v. Bandai Namco Games Am. Inc.*, the claims disclosed a specific set of rules “defin[ing] morph weight sets as a function of the timing of phoneme sub-sequences” to improve three-dimensional computer animation.[32] And in *DDR Holdings, LLC v. Hotels.com L.P.*,[33] the claims recited a specific series of steps to create an unconventional hybrid webpage in order to solve the problem host websites faced with retaining visitors who clicked on products sold on third-party websites.[34] These decisions reaffirm the rule that to be patent-eligible, claims must be limited to a specific technological solution for achieving the claimed result. The ’158 patent fails to claim a specific technological solution. Instead, it impermissibly claims an abstract idea.

**2.2. *Alice* step two: There is nothing more.**

*Alice* step two looks to “determine whether the claims do significantly more than simply describe [the] abstract method,” and thus, transform the abstract idea into patentable subject matter.[35] The Court is to look to see whether there are any “additional features” in the claims that constitute an “inventive

[30] *Apple, Inc.*, 842 F.3d at 1245.

[31] 822 F.3d 1327, 1336-37 (Fed. Cir. 2016).

[32] 837 F.3d 1299, 1313 (Fed. Cir. 2016).

[33] 773 F.3d 1245 (Fed. Cir. 2014).

[34] *Id.* at 1257-58.

[35] *Ultramercial, Inc.*, 772 F.3d at 715 (citations omitted).

concept," thereby rendering the claims eligible for patenting even if they are directed to an abstract idea.[36] Those additional features must be more than "well understood, routine conventional activity."[37] Neither "generic" computer technology, nor "well-understood, routine, conventional" or "purely functional" elements can supply the required inventive concept.[38] Rather, to provide an inventive concept, the '158 patent must claim a "technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way)."[39]

The claims reference, at most, three types of generic technology—RFID systems, video systems, and computing systems including "storage" of some type. The claims recite each of these in the most abstract way without specifying any technological innovation with respect to any of them.

The specification makes it clear that the claims are *intentionally* generic, demonstrating that none of the claimed systems is new and improved and that any old generic RFID, video, and computer storage systems will do the trick. The specification states,

> In one embodiment, the automatic location identification technology comprises radio frequency identification (RFID) tag technology that gathers data by requiring assets to physically touch a reader (passive location technology) or by passing near to a reader (active location technology). Active tags activate, or wake-up when they pass through or receive a localized radio frequency signal and then transmit their ID number to a reader. … The RFID

---

[36] *Alice*, 573 U.S. at 221.

[37] *Mayo*, 566 U.S. at 79 (citations omitted); *Ultramercial*, 772 F.3d at 715 (citation omitted.

[38] *Alice*, 573 U.S. at 226 (quoting *Mayo*, 566 U.S. 73, 77, 82).

[39] *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016).

> data is collected as the assets enter or leave the store 40 and as they move into or out of certain defined areas, or zones.[40]

The specification identifies a number of Axcess' other RFID patents and patent applications as suitable for "a particular embodiment" of the system,[41] but neither the claims nor the specification suggest that the RFID systems recited in the claims are limited to the RFID systems disclosed in Axcess' other patents. Rather, these are merely exemplary of the broad and unlimited scope of the generic RFID technology recited in the claims.

Similarly, the video systems recited in the claims are essentially *any* video systems that can record video. Claim 14 recites "recording a video image of the wearer of the RFID tag at the access door." *Any* video system can do this, as the claim does not, in any way, purport to improve generic video systems:

> The video may be black and white video, color video, infrared video, or any other suitable visual information capable of providing information at a scene. The cameras may be digital network video cameras, which can connect directly to a data network, or they may be any standard video camera connected to a conversion and compression device, which records and/or prepares the video data for transmission over the Internet 12.[42]

As with the generic RFID systems, the specification describes "one embodiment" as potentially using the video systems described in other Axcess patents, but neither the claims nor the specification suggest that the video systems recited and claimed are limited to these systems.[43] Instead, any generic video

---

[40] '158 patent at 4:50–64.

[41] *Id.* at 4:65–5:13.

[42] *Id.* at 5:63–6:3.

[43] *Id.* at 6:14–39.

system will do—so long as it performs its conventional functions of recording video and (at least for one independent claim) being remotely controlled.[44]

Like the recited RFID and video systems, the recited computing and storage systems are generic, with no recited improvements to establish an "inventive concept." For instance, Claim 14 requires that somehow a determination is made that the wearer of a tag is authorized and somehow a door is opened in response, but nothing in the claim suggests that there is some technological advance here. Claim 1 requires "storing" video and RFID data, but is agnostic as to how, and Claim 19 requires some device to make a "determin[ation]" that an RFID action corresponds with a pre-defined "alert condition." Neither the claims nor the specification describe any innovative technological solution directed to achieving these aspirations.

If there were any doubt that the '158 patent is *not* directed to a "technology-based solution"[45] the flow charts in Figures 4 through 7 remove it. Figure 4, right, and the written description discussing it, provide no detail—technological or otherwise—about how any of the steps of the claims as represented by the flow charts are achieved. The first step in Figure 4—elicit a radio response from RFID tag at access door of secure area—just happens, with no description of *how* it happens. This is consistent with the generic step recited in Claim 14: "eliciting a radio response from a radio frequency identification (RFID) tag at an access door of a



FIG. 4

[44] '158 patent, Claim 1 ("providing the subscriber with access to and control of a video camera in the video system at the facility").

[45] *Bascom Glob. Internet Servs., Inc.*, 827 F.3d at 1351.

secure area." The specification describes this step in the exact same generic way: "[T]he method begins at step 200 in which a radio response is elicited from an RFID tag at an access door of a secure area of a monitored facility."[46] At the next step of the flow chart—step 202—a "video image" is obtained. The specification and Claim 14 are agnostic as to the specific technology of how this gets done. So, the specification states, "[n]ext at step 202, one or more video images of the wearer of the RFID tag is obtained from a camera covering the access door."[47] And Claim 14 says the same thing, "recording a video image of the wearer of the RFID tag at the access door." There is not even arguably an inventive concept at play in a system that uses generic video recording—to record video.

The next step—which for a system that is supposed to secure important locations should be among the most important—is described in the same abstract way as every other step. So, at step 204, the system asks "authorized access?" The specification tells us this step is accomplished like this:

> Proceeding to decisional step 204, it is determined if the requested access is authorized based on the radio response from the RFID tag. If access is authorized, the Yes branch of decisional step 204 leads to step 206 in which the access door is opened. If access is not authorized, the No branch of decisional step 204 along with step 206 leads to step 208.[48]

This generic recitation of generic technology doing exactly what that generic technology has always done is exactly what is claimed in Claim 14: "determining whether access by a wearer of the RFID tag to the secure area is authorized based on the radio response." There is nothing in this claim, its dependent claims, the other independent claims, or the specification that suggests

[46] '158 patent at 9:16–19.

[47] *Id.* at 9:20–23.

[48] *Id.* at 9:25–30

any technological advance over generic RFID, video, and computer or storage systems. Thus, under *Alice* step two, there is nothing more to turn the abstract idea into patentable subject matter.

## CONCLUSION

The ’158 patent is expressly—and explicitly—directed to implementing the abstract idea of remotely monitoring, controlling access to, and/or generating reports about a facility or area within the generic environment of RFID and video systems. Nothing in the claims or specification suggests that the inventor improved the underlying functionality of any of this generic equipment or sought to solve any particular technological problem by combining it. As such, the ’158 patent seeks ownership over the an abstract idea itself, and as a result, is patent ineligible. Thus, Genetec respectfully requests that the Court grant Genetec’s motion to dismiss this case with prejudice.

Dated: February 8, 2019

Respectfully submitted,

*Of Counsel:*
Grant Kinsel
PERKINS COIE LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101
(206) 359-3516
gkinsel@perkinscoie.com

/s/ *Arthur G. Connolly, III*
Arthur G. Connolly, III (#2667)
CONNOLLY GALLAGHER LLP
1000 West Street, Suite 1400
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
*Attorneys for Genetec (USA) Inc.*